IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

CHAD TRENT WILCHYNSKI                                        PETITIONER

VS.                                        CIVIL ACTION NO.  3:10-CV-63-FKB

JESSICA JOY WILCHYNSKI                                        RESPONDENT


## MEMORANDUM OPINION AND ORDER

Before the Court are the Verified Petition for Return of Children to Petitioner and

Petition for Immediate Issuance of Show Cause Order to Respondent (Document number 1),

filed by Petitioner Chad Trent Wilchynski, and the Motion to Dismiss Pursuant to Federal Rules

of Civil Procedure 12(b)(1) and 12(b)(6) (Document number 11), filed by Respondent Jessica Joy

Wilchynski.  The petition is filed under the Hague Convention on the Civil Aspects of

International Child Abduction, as codified in the International Child Abduction Remedies Act

("ICARA"), 42 U.S.C. § 11601.  The matter has been referred to the undersigned pursuant to 28

U.S.C. §636(b)(1)(B) and Rule 72(b) of the Federal Rules of Civil Procedure.  The Court held a

hearing on the petition and pending motions on Monday, February 22, 2010, at which time the

Petitioner and the Respondent testified and presented other evidence.  Immediately after the

hearing, the Court requested a complete copy of the relevant files from the Court of Queen's

Bench of Alberta, Canada, Judicial District of Grande Prairie ("the Canadian Court").  This

Court received a certified copy of the files on Friday, February 26, 2010, and entered in this

Court's record as a sealed document that same day. See  Document numbers 17 and 18.  By the

Order entered on February 26, 2010, at Document number 17, the Court gave the parties until

Thursday, March 4, 2010, to file supplemental memoranda.  Furthermore, pursuant to 28 U.S.C.

§ 636( c) and Federal Rule of Civil Procedure 73, the parties have consented to the Magistrate

Judge to conduct all proceedings and enter final judgment, Document Number 24, and the

District Judge has entered an Order of Reference. Document number 25. Having considered the

filings, and for the reasons outlined below, the Court finds that the Respondent's Motion to

Dismiss should be denied, and that the Petition should be granted, in part, with certain

undertakings.

## I. BACKGROUND AND PROCEDURAL HISTORY

Mr. Wilchynski originally filed his petition in this Court on January 29, 2010, and

brought the matter to the Court's attention when he filed his Motion to Expedite Hearing on

February 8, 2010. On February 9, 2010, the District Judge entered an Order referring the pending

matters to the undersigned. Document number 7. That same day, the undersigned entered an

Order granting the Motion to Expedite hearing and setting a hearing on the Petition for February

22, 2010. Document number 8. The February 22 hearing date was contingent on service of the

Order and Petition upon the Respondent such that she received seven days' notice of the

hearing.[1] On February 16, 2010, the Petitioner filed a Notice of Service, offering proof that the

---

[1] Section 11603(c) of ICARA states that "notice of an action brought under subsection (b) of this section shall be given in accordance with the applicable law governing notice in interstate child custody proceedings." Under the Uniform Child Custody Jurisdiction and Enforcement Act, Miss. Code Ann. § 93-27-101 et seq. (Rev. 2004), Mississippi's enactment of the Hague Convention on the Civil Aspects of International Child Abduction, parties are entitled to the same notice of hearings as is given "child custody proceedings between residents of this state." Miss. Code Ann. § 93-27-205. Pursuant to Rule 81(d)(2) of the Mississippi Rules of Civil Procedure, child custody "matters shall be triable 7 days after completion of service of process in any manner other than by publication. . . ." Thus, the Respondent was entitled to seven day's notice of the hearing. In this case, the Respondent, Mrs. Wilchysnki, received notice of the hearing on February 12, 2010, ten days before the hearing set for February 22, 2010. See Document number 10 (Proof of Service). Moreover, at the hearing, the Respondent made no objection to the proceeding based upon insufficient notice.

Respondent was served on February 12, 2010. <u>See</u> Document number 10. Accordingly, the matter went forward, and the hearing followed on February 22, 2010.

A brief overview of the Wilchynskis' marital and litigation history will aid in the consideration of this matter. The Wilchynskis were married in the United States on February 14, 2001. Mr. Wilchynski is a citizen of Canada, and Mrs. Wilchynski is a citizen of the United States. Two children were born of the union: E.C.W., born on August 31, 2001, in Amarillo, Texas, and L.D.W., born on June 2, 2005, in Edmonton, Alberta, Canada. The children have dual Canadian/ United States citizenship. The Wilchynskis resided in the United States from the time they were married in February 2001 until July 2004, when they moved to Grande Prairie, Alberta, Canada. The Wilchynskis resided in Grande Prairie as a family until July or August 2008[2], when Mr. and Mrs. Wilchynski separated. On October 2, 2008, the Canadian Court entered a Consent Interim Without Prejudice Order. Exhibit 5 to the Petition; Document number 2-6 (sealed). This order did not grant a divorce to the couple, but set forth certain parameters governing the custody of the children, allocated certain real and chattel property, and listed the child and spousal support Mr. Wilchynski would pay. According to the Canadian Court Order, Mrs. Wilchynski was to remain with the children in the family home in Grande Prairie, and Mr. Wilchynski would reside nearby in a family trailer. The Order provided that beginning October 1, 2008, Mr. Wilchynski would pay $3,000.00[3] per month in spousal support, plus $1,529.00 per month in child support. The Canadian Court also determined that the parties would divide the

---

[2]It is not entirely clear to the Court, but it appears that Mr. Wilchynski's employment caused him to be away from the family all but sixteen weeks of the year. <u>See</u> Mrs. Wilchynski's Reply to Statement Parenting, filed September 8, 2008.

[3] It is assumed that all figures are in Canadian dollars.

"parenting time" on a rotating basis between them as follows: five days with Mr. Wilchynski, and nine days with Mrs. Wilchynski. This carefully crafted arrangement, however, deteriorated because of the Wilchynskis' financial situation and other factors.

From the October 2, 2008, entry of the Consent Interim Without Prejudice Order, Mr. Wilchynski would not or could not meet its financial demands. According to a Debtor Yearly File Summary, Document Number 18-2 (sealed), Mr. Wilchynski ended the 2008 year $13,652.60 in arrears in his spousal and child support, having paid only $600.00 from October 1 to December 31, 2008. Furthermore, during 2009, Mr. Wilchynski apparently lost his employment, declared bankruptcy, and ended the year 2009 in arrears in the amount of $37,211.42 in spousal and child support payments. These events impacted Mrs. Wilchynski and the children by causing them to lose the family home and their vehicle, as well as by negatively altering their standard of living. The Wilchynskis' relationship apparently worsened, as is evidenced by the entry on March 16, 2009, of a "Without Prejudice Restraining Order" that restrained Mr. Wilchynski from being within 75 meters of Mrs. Wilchynski's home or employment, effective until September 2, 2009. Respondent's Petition Hearing Exhibit 1.

Furthermore, although Mrs. Wilchynski had obtained employment, she also was in desperate financial straits. According to Court filings and her hearing testimony, she was forced to file for and receive government assistance for food and day care for the children, she was forced to obtain food from the Salvation Army, and her son's parochial school provided their Christmas gifts in 2008. According to Canadian Court documents, as early as November 27, 2008, Mrs. Wilchynski asked the Canadian Court for sole custody of the children so that she could return home to Tennessee where she had family support, citing lack of financial support by

-4-

Mr. Wilchynski. Document number 2-7 at 5 (sealed). Once again, on January 7, 2009, Mrs. Wilchynski repeated this request by asking the Canadian Court for permission to relocate to Tennessee, so that she could have some family support, stating that Mr. Wilchynski had refused to provide child or spousal support. Document number 2-7 at 2 (sealed).

Another factor motivating Mrs. Wilchynski to return to the United States was the terminal illness of her father, who resided in Tennessee. Document Number 2-8 at 2 (sealed). On January 7, 2009, the Canadian Court entered an Order allowing Mrs. Wilchynski to take the children to Tennessee for not more than 2 weeks during the 2009 Easter school break. Document number 2-8 at 3(sealed). In a later court filing, Mrs. Wilchynski stated that she was unable to travel with the children over Easter because Mr. Wilchynski had refused to give her the children's birth certificates so that she could obtain proper travel documents. Document number 2-9 at 3 (sealed). On June 10, 2009, Mrs. Wilchynski filed an affidavit with the Canadian Court requesting an order giving her the ability to travel with the children to Tennessee from June 15, 2009, to August 31, 2009, to be with her ailing father. Document number 2-9 at 2 and 11 (sealed). In the affidavit, she stated that Mr. Wilchynski had originally consented to the trip, but withdrew his consent at a later date. Attached to her affidavit were documents showing that she had obtained emergency passports for the children and had booked one-way tickets to the United States based upon Mr. Wilchynski's earlier consent to the trip. Id. at 3 (sealed). She stated, furthermore, that she could not afford to re-book the tickets[4] because Mr. Wilchynski was, as of June 10, 2009, $31,796.04 in arrears in spousal and child support, even though he had paid $8,618.36 in support between January 1, 2009, and June 10, 2009. Id. at 9 (sealed). At the

---

[4]At the hearing, Mrs. Wilchynski testified that her relative had paid for the tickets.

hearing on the Petition, Mrs. Wilchynski also testified that she was in such desperate financial need in June 2009 that her electrical service had recently been terminated, that at one point she had relocated with the children to a women's shelter, and that she was driving a borrowed vehicle that she would soon have to return to a friend. She further testified that Mr. Wilchynski stated that, if Mrs. Wilchynski would call the relevant Canadian authorities and arrange to drop or forgive the arrearage in spousal and child support funds, he would allow the children to go to the United States with her; otherwise, she could make the trip by herself to see her father. Mr. Wilchynski did not dispute this testimony.

On June 11 and 12, 2009, the Canadian Court held a hearing on Mrs. Wilchynski's request to travel to the United States for the summer. According to Petition hearing testimony, the Canadian Court gave Mrs. Wilchynski twenty-four hours to produce statements from her landlord and employer that they planned to hold her housing and job for her while she was in the United States. At the Petition hearing, Mrs. Wilchynski admitted that she did not meet the Canadian Court's deadline for submission of this information. Before the Court issued a ruling, however, Mrs. Wilchynski apparently left Canada on or about June 23, 2009, with the children, traveling five days by rented vehicle, described by her as a "U-haul," to the United States to be with her ailing father.[5] On June 26, 2009, after considering evidence of Mrs. Wilchynski's move or attempted move from Grande Prairie, as presented by Mr. Wilchynski, the Canadian Court entered an Ex Parte Order. Document number 2-10 at 3 (sealed). The Ex Parte Order, among other things, directed Mrs. Wilchynski to return the parties' children "forthwith" to Grande

---

[5]According to Mrs. Wilchynski's testimony at the hearing, her father subsequently died on July 31, 2009.

Prairie and directed any peace officer "having jurisdiction" to "do all things necessary including, without limitation, arresting and detaining" Mrs. Wilchynski to bring her before the Canadian Court to "show cause why she should not be cited for civil contempt." Id. At the hearing on the Petition before this Court, Mrs. Wilchynski testified that she was never served with a copy of this Order.

Contact between Mr. Wilchynski and Mrs. Wilchynski was limited in the weeks following her June 23 departure from Canada. According to Mrs. Wilchynski's testimony at the Petition hearing, she made contact with him within a few weeks of her departure, and in the meantime he had made contact with members of her family to determine her whereabouts. He testified that he did not hear from her until October 2009. The record clearly shows that by August 7, 2009, he was aware that she had relocated to Brookhaven, Mississippi, because at that time he served her with a statement to vary child support. Document 18-2 at 1 (sealed). During the hearing on the Petition, Mrs. Wilchynski testified that, during the months following her June 2009 departure from Canada, she participated via telephone in two child support hearings, but that no judge ever ordered her to return to Canada with the children. The frequency and quality of Mr. Wilchynski's contact and communication with the children since June 2009 is unclear, but it is apparent that some telephone communication occurred. At the Petition hearing, Mr. Wilchynski testified that he has not seen the children since they came to the United States, stating, in effect, that he did not want to walk into a trap, and that he decided that the matter would be best resolved by the court system.

Since June 2009, the Canadian Court has maintained jurisdiction over Mr. Wilchynski's support obligations and has altered them. On September 9, 2009, the Canadian Court entered an

"Interim Without Prejudice Variation Order" which reaffirmed Mr. Wilchynski's obligation to pay $1,529.00 per month in child support. The order terminated spousal support payments as of August 1, 2009, but also formulated a plan for Mr. Wilchynski to pay the arrears of his support in the amount of $700.00 per month, for a total of $2,229.00 per month until he satisfied the arrears. Document Number 2-11 at 3 (sealed). On January 27, 2010, the Canadian Court entered a "Variation Order" which reduced Mr. Wilchynski's child support obligations to $1,180.00 per month, retroactive to January 1, 2009, and thereby reduced his arrears by $4,188.00 as of January 18, 2010[6]. Document Number 18 at 3. The Court further ordered Mr. Wilchynski to pay $200.00 toward the arrears of his child support each month. Id. Even with the Canadian Court's retroactive reduction of Mr. Wilchynski's financial support obligations dating back to January 1, 2009, the documents before this Court demonstrate that Mr. Wilchynski is still over $34,000.00 in arrears in child and spousal support.

Despite Mr. Wilchynski's lack of financial support of the children and Mrs. Wilchynski, and despite the entry of a "Without Prejudice Restraining Order," Respondent's Petition Hearing Exhibit 1, there are no allegations of physical abuse in this case. The "Without Prejudice Restraining Order," entered on March 16, 2009, prohibited Mr. Wilchynski from coming within 75 meters of Mrs. Wilchynski at her home or her work, but did not pertain to the children. Mrs.

---

[6]The Canadian Court arrived at this figure by subtracting the January 2010 child support payment of $1,180.00 from the previously order child support payment of $1,529.00, for a monthly reduction of $349.00. The Canadian Court then applied the reduction retroactively to January 1, 2009, thereby multiplying the $349.00 reduction of child support by twelve months, thus arriving at a reduction in arrears in the amount of $4,188.00. Although there is a typographical error in the Order, stating that the arrears is reduced "to" $4,188.00, rather than "by" $4,188.00, the intent of the Order, the wording of Mr. Wilchynski's request for reduction, and the parties' testimony at the petition hearing lead to the latter interpretation.

Wilchynski testified during the Petition hearing that prior to the separation, Mr. Wilchynski was very stable, but that his post-separation behavior prompted her to seek the restraining order. During the process of the separation, he apparently punched a hole in the wall of their home in an outburst. Mr. Wilchynski did not dispute this at the hearing. Moreover, according to Mrs. Wilchynski's testimony at the hearing, Mr. Wilchynski apparently engaged in unusual– perhaps menacing and/or harassing– behavior after the couple's separation, such as sitting outside her home, taking photos of her, dying his hair, and obtaining tattoos, all of which scared her. However, Mrs. Wilchynski testified that, since they had separated, he had bonded more closely with the children. He testified credibly that he has no criminal record nor any type of criminal history, and that he never threatened her with any type of physical violence. Mrs. Wilchynski did not dispute this.

Considering this picture of events, the Court turns to analyze the Petition and the pending Motions.

## II.  DISCUSSION

### A. The Convention and the Burdens of Proof

As stated above, the Petition is filed pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"), as codified in the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601. The aim of this legislation is the "prompt return of children who have been wrongfully removed or retained" unless certain exceptions apply, as are more fully described below. 42 U.S.C. § 11601(a)(4).[7] A decision

_____

[7]By the word "prompt," the Convention states that the relevant judicial authority "shall act expeditiously" to reach a decision "within six weeks from the date of commencement of the proceedings." Article 11 of the Convention. As the recitation of the procedural history of the

under this Convention is not to be taken as a determination on the merits of any custody issue.

Article 19. Moreover, it is beyond the power of this Court to determine the merits of any

underlying child custody claims. 42 U.S.C. § 11601.

Article 3 of the Convention dictates that the limited issues to be decided by this Court are,

as follows:

> The removal or the retention of a child is to be considered wrongful where –
>
> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for removal or retention.

Walton v. Walton, 925 F.Supp. 453 (S.D. Miss. 1996)(Russell, J.). The Petitioner must establish

these elements by a preponderance of the evidence. 42 U.S.C. § 11603.

The Respondent may raise certain defenses to the petition to oppose the return of the

children, with varying burdens of proof. The Respondent must establish by clear and convincing

evidence that the return of the children would expose them to a grave risk of physical or

psychological harm "or otherwise place the child[ren] in an intolerable situation." Article 13(b);

42 U.S.C. § 11603(e)(2)(A). Another defense available to the Respondent is that return of the

children would not be permitted by the requested State's[8] fundamental principles "relating to the

protection of human rights and fundamental freedoms." Article 20. This defense must also be

proven by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

---

case demonstrates, the Court has acted expeditiously on the matter, while ensuring that relevant state and federal notice and procedural requirements have been met.

[8]In this case, the "requested State" is the United States.

The two remaining defenses or exceptions to return must be proven by a preponderance of the evidence standard. Id. at § 11603(e)(2)(B). Pursuant to Article 12, if the Petition is filed more than one year after the removal, the Respondent may argue that the children are now "well-settled" in their new environment. The Respondent may also assert that the Petitioner was "not actually exercising the custody rights at the time of removal or retention," or that the Petitioner "had consented to or subsequently acquiesced in the removal or retention." Article 13(a).

If the Petitioner meets his burden of proof, and the Respondent fails to establish one of the available defenses, then the Petitioner is entitled to return of the children. Furnes v. Reeves, 362 F.3d 702, 712 (11th Cir. 2004).

## B. Respondent's Motion to Dismiss

Turning to the Respondent's Motion to Dismiss, she first argues that this Court lacks jurisdiction because the Petitioner has not shown that the removal of the children was in breach of Mr. Wilchynski's rights of custody. At the hearing, counsel made the argument that Mrs. Wilchynski had sole custody of the children. Without delving into the law of Alberta, Canada, governing the custody rights of parents and the appropriate "bundle" of rights, this argument is belied by the facts as presented by the filings and the parties' testimony. Mrs. Wilchynski admitted at the hearing that Mr. Wilchynski had consistently exercised his custody rights. She admitted that Mr. Wilchynski provided care for the children on the five consecutive days out of fourteen days when the children were allocated to him, from the September 2008 entry of the Order setting forth the custody arrangement until the time she removed them from Canada in June 2009. She also admitted that she saw the children little, if any, on the days that the children were with Mr. Wilchynski. Furthermore, her requests to the Canadian Court for sole custody of

the children imply that the parties exercised joint custody rights, as we understand them in the American court system. Simply put, it is clear to the Court that Mr. Wilchynski's rights were those amounting to "joint custody," not simply "rights of access" or visitation rights.[9] "The Hague Convention provides a remedy of return only for a parent who holds 'rights of custody.'" <u>Abbott</u>, 542 F.3d at 1087. Accordingly, the argument that this Court is without jurisdiction to entertain this petition fails, and the Motion to Dismiss filed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure should be denied.

Further, the undersigned finds that the Respondent's Motion to Dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should be denied. The Respondent argues that the Petition fails to state sufficient facts upon which relief may be granted. For the reasons discussed below, the Court finds that Motion should be denied.

<u>C. Evidence Presented at the Hearing</u>

The Court now turns to consider the merits of the petition and evaluates it based on the evidence presented by the parties at the hearing and in their filings before the Court. In general, the analysis of the Petition is straight and to the point: did Mrs. Wilchynski's removal of the children breach Mr. Wilchynski's custody rights at the time of removal, and did he actually exercise those rights at the time of removal? The quick answer is simply, "yes." The analysis of the issue and the available defenses, however, is a bit more involved.

Having established, as set forth above in section II(B), that Mr. Wilchynski exercised his rights of custody at the time of removal, the Court must now determine whether the removal of

_____

[9]"Rights of access" or visitation rights do not constitute "rights of custody" within the meaning of the Hague Convention. <u>Abbott v. Abbott</u>, 542 F.3d 1081 (5th Cir. 2008).

the children breached those rights. The Court must also engage in an analysis of Mrs. Wilchynski's defenses to return of the children, as follows:

1. Will return of the children violate the United States' fundamental principles relating to the protection of human rights and fundamental freedoms?

2. If the petition was filed greater than one year after the children's removal, are the children now "settled" in their new environment?

3. Did Mr. Wilchynski consent to or subsequently acquiesce in the removal or retention of the children?[10]

4. Will return of the children subject them to grave risk of physical or psychological harm?

5. Will return of the children place them in an intolerable situation?

Based upon the testimony of the parties and the evidence presented to the Court, the Respondent has failed to show that her removal of the children did not breach Mr. Wilchynski's custody rights. According to filings before the Court, both of the Wilchynskis were named as guardians of the children and had joint custody of the children. Although under Alberta law the guardian of a child has the right to "decide the child's place of residence and to change the child's place of residence," Alberta Family Law Act, Chapter F-4.5(21)(6)(b) (2005)(Alta.), it defies logic to argue that this right can be exercised independently of the other guardian to remove the children from the same city in which the other guardian is located, much less remove the children to another country. See Furnes v. Reeves, 362 F.3d 702 (11th Cir. 2004)(finding

_____

[10]The Court has previously answered the other aspect of this defense by finding that Mr. Wilchynski actually exercised his custody rights at the time of removal.

that mother's unilateral removal of child from Norway, as opposed to relocation within Norway, violated father's right under Norwegian law to determine place of residence for child). Moreover, Mrs. Wilchynski's filings before the Canadian Court imply that she knew she did not have a court-sanctioned right to remove the children from Canada since she sought permission from the Court to take the children to the United States when Mr. Wilchynski apparently withheld his consent. Accordingly, Mrs. Wilchynski's removal of the children from Grande Prairie, Alberta, Canada, breached Mr. Wilchynski's custody rights.

      1. Will return of the children violate the United States' fundamental principles relating to the protection of human rights and fundamental freedoms?

      The Court now addresses whether a return of the children would violate the fundamental principles relating to the protection of human rights and fundamental freedoms. The Court determines that the courts of Alberta, Canada will more than adequately protect human rights and fundamental freedoms. Accordingly, this defense does not provide an avenue of relief for Mrs. Wilchynski.

      2. If the petition was filed greater than one year after the children's removal, are the children now "well-settled" in their new environment?

      In this case, the petition was filed within one year of the removal of the children from Canada. Therefore, the defense that the children are now "settled" in their new environment is not available to Mrs. Wilchynski. Article 12 of the Convention.

      3. Did Mr. Wilchynski consent to or subsequently acquiesce in the removal or retention of the children?

      It is clear from the record that Mr. Wilchynski did not consent to or subsequently

acquiesce to the removal or retention of the children. Upon his discovery of their disappearance, he immediately petitioned the local Alberta Court for a order requiring their return, which the Court granted. Court documents show, furthermore, that he had withheld his consent for the children to travel to the United States. Furthermore, although Mrs. Wilchynski testified that Mr. Wilchynski mentioned that he would like to move to the United States so that he could be near them, there is not sufficient evidence to show that to be the case, nor can such a statement, even if true, be accepted as acquiescence. While it is puzzling to the Court that Mr. Wilchynski waited from June 2009 to January 29, 2010, to file this petition, there is simply no evidence substantiating a defense that he acquiesced. Accordingly, this defense fails.

> 4. Will return of the children subject them to grave risk of physical or
> psychological harm?

The Court now determines whether the return of the children will subject them to grave risk of physical or psychological harm. Article 13(b); 42 U.S.C. § 11603(e)(2)(A). The Respondent must establish this defense by clear and convincing evidence. Id. The risk of harm contemplated by Article 13 of the Convention is the risk of two types of harm: (1) imminent danger, such as "returning the child to a zone of war, famine, or disease," or (2) "grave risk of harm in cases of serious abuse or neglect, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." Friedrich v. Friedrich, 78 F.3d 1060, 106 (6th Cir. 1996). Having observed the testimony and demeanor of the Wilchynskis at the hearing, and having noted the filings in the record, the Court concludes returning the children to Canada will not expose them to a grave risk of physical or psychological harm. The testimony at the Petition hearing demonstrated that, although there existed a

restraining order between Mr. Wilchynski and Mrs. Wilchynski, Mr. Wilchynski has no history of physical violence. In fact, Mrs. Wilchynski said that Mr. Wilchynski's relationship with his children improved during their separation because he spent more time with the children. Accordingly, the Court finds that the children will not be exposed to a grave risk of physical harm if they return to Canada.

As to psychological harm, although one cannot discount the emotional strain and trauma that uprooting the children at this point will cause, the parties offered no expert testimony, either pro or con, to substantiate any allegations of psychological harm. Only Mrs. Wilchynski testified that, in the case of her son, he no longer attends any type of counseling and has made the honor roll at his school. She offered no testimony as to any psychological harm a return would have on her daughter. Although the Court is sympathetic to Mrs. Wilchynski's concerns for her children's psychological well-being, this provision of the Convention is not meant to protect against mere "*adjustment* problems that would attend the relocation of most children." Friedrich, 78 F.3d at 1067(emphasis in original). Accordingly, the Respondent failed to show by clear and convincing evidence that returning them to Canada will pose a grave risk of psychological harm.

5. Will return of the children place them in an intolerable situation?

The issue of whether the children will return to an intolerable situation, however, gives the Court some pause. "Generally speaking, a mere shortage of money is not, on its own, sufficient to establish an 'intolerable situation.'" Krefter v. Wills, 623 F.Supp.2d 125 (D. Mass. 2009)(citing Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. At 10,510 ("A review of deliberation on the Convention reveals that 'intolerable situation' was not intended to encompass return to a home where money is in short supply.")). The Court,

however, cannot turn a blind eye to the financial conditions as they exist for Mrs. Wilchynski and the children. Turning to the documents and testimony presented in this case, there exists the issue of Mr. Wilchynski's arrearage in child support and spousal support payments. Although Mr. Wilchynski paid nearly $4,700.00 in spousal and support payments between January 1 and February 4, 2010, <u>see</u> Respondent's Exhibit 2, documents before the Court show that he is still nearly $35,000 in arrears in these payments. Although Mr. Wilchynski testified that he now lives in a three bedroom condo, and Mrs. Wilchynski testified that Mr. Wilchynski and his family provided for the children when they were with him, it appears that neither Mr. Wilchynski nor his family assisted with the children's financial needs when they were with her. Mrs. Wilchynski's testimony, undisputed by Mr. Wilchynski, demonstrated that, although she was working when she was in Canada, she and the children were nearly destitute. Mrs. Wilchynski testified that she and the children did not have a vehicle because Mr. Wilchynski took it to satisfy bankruptcy debts, their electricity had been terminated, and that, on occasion, she relied on charities or the children's school to provide certain things for the children. Mr. Wilchynski failed to pay the court mandated amounts of child and spousal support, and Mrs. Wilchynski was forced to apply for government aid that included both food and day care supplements. Mrs. Wilchynski testified and submitted documents showing that she received government assistance to pay for the children's day care and after school care while she worked, and Mr. Wilchynski failed to pay anything toward day care services. There is also the issue of whether Mr. Wilchynski could live up to his prior "undertaking" or commitment under Canadian law to sponsor Mrs. Wilchynski for permanent resident status in Canada. Document 2-7 at 19 (sealed). Nor is it known to the Court whether Mrs. Wilchynski could even apply for permanent resident status in Canada because Mr.

Wilchynski could be in default of his previous undertaking in that she and the children received social assistance or welfare during the previous "undertaking." Id. at 21. Should the Court order her return to Canada with the children, she now has no guarantee of a job, and her alien status may impede her ability to work and to receive government aid for the children. As she testified in the Petition hearing, she has no idea how she would obtain a job, housing, or money if the Court ordered her to return to Canada with the children. Thus, it could be argued that, based on the record of Mr. Wilchynski's arrearage in his court-ordered support and Mrs. Wilchynski's lack of financial resources in Canada, returning the children to Canada without some financial provision amounts to an "intolerable situation."

Although the Court realizes that the financial situation of the Wilchynskis does not begin to compare with the circumstances of "grave harm" contemplated by the Convention, such as war, famine, or spousal or child physical abuse, it can neither ignore the desperate financial situation at hand. To that end, the Court has at its disposal the "authority to impose conditions, known as undertakings, to ensure that a potential harm 'does not manifest' when a child returns to his or her country of habitual residence." Krefter, 623 F.Supp.2d at 137 (citing Kufner v. Kufner, 480 F.Supp.2d 491, 515 n.34 (D.R.I. 2007)(" [W]here the potential for harm is real, even if it does not meet the Article 13(b) definition, [a court] . . . has an obligation to attempt to ensure that it does not manifest."), aff'd, 519 F.3d 33, 41 (upholding conditions imposed by district court on child's return)). Other courts have employed undertakings to ensure that an unqualified return order is not detrimental to a child. See Feder v. Evans-Feder, 63 F.3d 217, 226 (3d Cir. 1995)(instructing district court to consider them on remand); Danaipour v. McLarey, 286 F.3d 1, 21 (1st Cir. 2002)("Undertakings can be an important tool for courts to comply with the

Convention's strong presumption of a safe and speedy return of a wrongfully removed child.") "'Typical undertakings concern support, housing and the child's care pending resolution of the custody contest.'" Blondin v. Dubois, 238 F.3d 153, 159 n.8 (quoting Carol S. Bruch, *The Central Authority's Role Under the Hague Child Abduction Convention: A Friend in Deed*, 28 Fam. L.Q. 35, 52 n.41 (1994)(explaining use of undertakings by British courts)). Courts have even employed undertakings to ensure the dismissal of pending criminal charges against the removing parent related to the removal of the children. See Jaet v. Siso, 2009 WL 35270 (S.D. Fla. Jan. 5, 2009).

In a case with certain similarities to this one, Krefter v. Wills, 623 F.Supp.2d 125 (D. Mass. 2009), the Court granted the petition, but ordered the petitioner to meet certain financial undertakings. In Krefter, the removing mother was an American citizen who had married a German citizen. Krefter, 623 F.Supp.2d at 128. While the family resided in Germany for several years, they spent significant amounts of time in the United States during the marriage. Upon the dissolution of the marriage, the mother and child remained in Germany near the father, and the mother returned to the work force. For reasons related her immigrant status, however, she was unable to obtain employment sufficient to support her and her daughter financially, despite working two jobs. The father's financial support, furthermore, was sporadic and varied dramatically. Faced with the inability to earn a sufficient living and lack of financial support from her husband, the American mother returned with her child to the United States, where she lived with her parents. Although the child adjusted well to school and life in the United States, the mother's financial situation remained dire to the point where she declared bankruptcy. Id. at 128 to 132. In that case, the court allowed the petition with certain undertakings or requirements

to be met before the child could return to Germany.  The Court ordered the father to pay in advance for the child and mother's return airfare to Germany, ordered the father to pay in advance three months of child support, ordered the father to procure suitable affordable housing, and ordered the parties to schedule proceedings expeditiously in the German courts so that the child's schooling would be minimally disrupted.  Id. at 138[11].

Likewise, in this situation, the Court finds that it cannot merely ignore the financial realities of the children and their mother, Mrs. Wilchynski.  To order them to return to Canada without any financial support would be simply to condemn the children and Mrs. Wilchynski to the same financial situation which existed before her flight to the United States.  This is a financial reality in which grave harm to the children and Mrs. Wilchynski, at least on the nine days out of fourteen in which they reside with Mrs. Wilchynski, could manifest itself.  Upon her return to Canada, Mrs. Wilchynski has no guarantee of a job, it is unclear how her immigrant status will affect her ability to obtain a job or government assistance, and she has no family support network.  Although Mr. Wilchynski has been ordered to pay support, and it appears that he is currently paying some support, there is no guarantee that his court-ordered support will continue at its current rate.  Moreover, the Court declines to order a return of the children without their mother to Canada, as she has been their primary caretaker throughout their lives, and separation of them from her at this point would be detrimental to the children's best interests.  Accordingly, in an effort to ensure that the children and Mrs. Wilchynski do not live in intolerable financial conditions in Canada until the Canadian courts have had an opportunity to

---

[11]In a subsequent Order, the Krefter Court ordered the petitioning father to provide his home for the exclusive use of the child and mother for three months upon their return to Germany.  Document number 37, available as a Westlaw link to Krefter, 623 F.Supp.2d at 125.

resolve the Wilchynskis' status, the Court requires the following conditions be met before the children are returned to Grande Prairie, Alberta, Canada:

1. Mr. Wilchynski shall pay to Mrs. Wilchynski, through the existing procedures set by the Canadian Courts to the Director of Maintenance Enforcement (as reiterated in the Variation Order dated January 18, 2010, and entered on January 27, 2010), $5,520.00 (an amount equaling four (4) months of support at the rate of $1,180.00 child support per month, plus $200.00 in arrearage payment per month).

2. Once the support payment of $5,520.00 has been paid, Mr. Wilchynski shall pay for the airfare for Mrs. Wilchynski and the children to return to Grande Prairie, Alberta, Canada, or to whatever city he may currently reside.

3. Both Mr. Wilchynski and Mrs. Wilchynski shall use reasonable efforts to schedule court proceedings forthwith in Canada so as to require minimal disruption of the children's schooling.

Mrs. Wilchynski shall return to Canada with the children as soon as these conditions are met. Mrs. Wilchynski remains under order of this Court not to remove the children from the Southern District of Mississippi until these conditions are met. Furthermore, within seven (7) days of entry of this Order, she is to surrender any passports held by the children to the Clerk of Court for safekeeping until the conditions 1 to 3 above are met.

Petitioner's counsel is to provide proof of compliance with conditions 1 to 3 by submitting a supplemental filing with the Court.

Because these conditions are limited in scope, they further the goal of prompt return of the children to Canada so that its courts may resolve the domestic and custody issues.

Furthermore, because these conditions do not require any action or enforcement of foreign courts, and, moreover, merely reinforce Mr. Wilchynski's already existing financial obligations, the conditions do not raise any concerns of international comity. See Krefter, 623 F.Supp.2d at 138.

Considering the totality of the circumstances, including Mrs. Wilchynski's poor financial condition, the undersigned finds that Mrs. Wilchynski has established that an award of Mr. Wilchynski's attorney's fees and costs against her is not appropriate. 42 U.S.C. § 11607 (b). Accordingly, Mr. Wilchynski's request for costs and attorney's fees is denied. The Petition, however, is granted with the above outlined financial undertakings.

### III. CONCLUSION

For the reasons set forth in this Memorandum Opinion and Order, the Petition is granted in part with certain financial undertakings. The Petitioner's request for costs and attorney's fees is denied.

SO ORDERED, this the __18th__ day of March, 2010.

         /s/F. Keith Ball
         UNITED STATES MAGISTRATE JUDGE